Ron Cook (443) 223- 7384
595 Center Drive
Severna Park, Maryland 21146

IN THE DISTRICT COURT OF THE UNITED STATES FOR
THE DISTRICT OF MARYLAND

Ronald Cook, Christine Cook, )
        Plaintiffs )
            )
            )   CASE NO.   **RDB 16 CV 3031**
v. )
            )
NATIONSTAR MORTGAGE, LLC, )
PATRICK BOWMAN, VICE PRESIDENT, )
FORECLOSURE, FINANCE & )
ADMINISTRATION )
THE BANK OF NEW YORK MELLON, )
BANK OF AMERICA, NA, TALISHA )
WALLACE, MICHELLE SJOLANDER, )
SENIOR VICE PRESIDENT, 1800 TAPO )
CANYON ROAD, )
SIMI VALLEY, CALIFORNIA, THOMAS K. )
 MONTAG, CHIEF OPERATING OFFICER )
101 NORTH TRYON STREET, CHARLOTTE, )
CAROLINA, )
ALBA LAW GROUP, P.A., MARK DEVAN, )
ESQ, THOMAS DORE, ESQ. )
COLLEGIATE CAPITAL ADVISORS, LLC, )
PATRICK W. HANSEN, )
        Defendants )
            )

**COMPLAINT FOR CIVIL RICO VIOLATION OF TITLE 18, US CODE, SECTIONS
1962(a),1962(c), 1962(d)**

TO ALL PARTIES OF INTEREST:

## I. STATEMENT OF THE CASE.

1. We, Ronald Cook and Christine Cook, acting as our own counsel, rely·upon <u>Haines v.</u>

<u>Kerner</u>, 404 US 519 (1972), pursuant to the limitations imposed upon us as Petitioners and this

Tribunal by the Constitution of the United States with authority and unalienable right to file a

Civil RICO case pursuant to Title 18 US Code, § 1962 et seq. Notice is hereby given that we, Ronald Cook and Christine Cook, do hereby give notice to the court that the Defendants have created a racketeering enterprise, an association-in-fact, an operational enterprise that is formed from the collective actions and omissions of all of the Defendants taken together. The interaction and association and business activities of the Defendants taken together is an association-in-fact, given the planning, accounting procedures, and administrative and court actions that are required by the Defendants, and the deliberate setting aside of the legal requirements legal notices and regulations that are required to be complied with.

2. There are more than two predicated acts of racketeering activities as follows: First Predicate Act of Racketeering: **Insurance Fraud, Double Recovery;** I put substantially less than 20% down on the loan, which triggered the use of mortgage insurance by the lender and their alleged assignees. The loan documents and statements I have reflect the existence of Mortgage Insurance, otherwise known as PMI. When there is a foreclosure by a lender who has purchased mortgage insurance they have engaged in mortgage fraud, bad faith and double recovery, see **Exhibit A**, attached and incorporated by reference. It is unlawful to recover the same debt more than once. The mortgage statements identify a line item for LPMI, which is Lender Private Mortgage Insurance. In this case, the alleged lender got paid once when the insurance claim was filed and once when the foreclosure sale occurred. As a result, the above described double recovery of the mortgage Debt by the Defendants, and all of them related to the above referenced Deed of Trust, without having been assigned the mortgage, is unlawful and a violation of Title 18, US Code § 891-894, Extortionate Credit Transactions and a violation of Title 18, US Code § 1962(a), collection of an unlawful debt and a violation of Title 15 US Code §§ 1692e, misrepresentation and 1692f, unfair practices. This double recovery is also a predicate act of racketeering under Title 18, US Code § 1962 et seq.

3. The Defendants participated in the mortgage fraud by selling our house to a real estate investor, and collecting money from a defaulted mortgage loan twice, once from the PMI insurance carrier and once from the sale of our house in a foreclosure sale. The real estate investor, Collegiate Capital Advisors, LLC purchased our house from someone who collected on mortgage insurance claims, which assisted the alleged mortgage creditor with their efforts at obtaining payment twice for the foreclosure of our home, and from the payment of an insurance claim, which constitutes double recovery. The above-described double recovery alleged executed by a MERS executive was intentionally calculated to deceive the Plaintiffs and to misrepresent themselves as creditors. MERS cannot assign a Deed of Trust as an agent of the original lender when the original lender is (a.) out of business and (b.) was never a member of MERS, and (c.) MERS was never in possession of a power of attorney from the original lender giving MERS authority to assign the mortgage. These predicate acts and activities misled the Plaintiff and were designed to unlawfully obtain title to the subject property, to the detriment of the Plaintiffs and they were done without reference to a lawful exercise of the lawful rights of the Defendants. The second and third acts predicate acts of racketeering was the filing of a foreclosure action in state court without standing  and the sale of the subject property in a foreclosure sale.

4. **Fourth Predicate Act of Racketeering:** The Broken chain of title in the Assignment of the Deed of Trust, Flawed and defective and Fraudulent Assignment of the Deed of Trust. The Deed of Trust is allegedly assigned by MERS to The Bank of New York Mellon in their capacity as the Trustee of the Successor Trustee to JP MORGAN CHASE BANK, NA, AS TRUSTEE FOR THE STRUCTURED ASSET MORTGAGE INVESTMENTS II TRUST MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2006-AR-1.

5. The major flaws in this assignment are two-fold. First, the Assignment was signed by a BANK OF AMERICA, NA employee, Talisha Wallace on June 7, 2013, and nowhere has there

been an effort by the signer to identify the document that gives her a power of attorney or an executive appointment by the MERS Board of Directors appointing Talisha Wallace as a MERS executive. Secondly, there is nowhere in the record where the original lender, COMMUNITY LENDING, INCORPORATED, can be identified on the MERS website as a member of MERS. COMMUNITY LENDING INC. was suspended by the California Franchise Tax Board, on March 2, 2009. At the time that the Assignment was executed on June 7, 2013, the original lender was already suspended and was no longer lawfully operating as a corporation in California. As a result, the alleged assignment by MERS of the above referenced Deed of Trust, without having been assigned the mortgage, is unlawful and a violation of Title 18, US Code § 891-894, Extortionate Credit Transactions and a violation of Title 18, US Code § 1962(a), collection of an unlawful debt and a violation of Title 15 US Code §§ 1692e, misrepresentation and 1692f, unfair practices. The above-described assignment alleged executed by a so called MERS executive was intentionally calculated to deceive the Plaintiffs and to misrepresent themselves as creditors so that they could collect the mortgage debt twice, see **Exhibit B**, attached and incorporated by reference. These predicate acts and activities misled the Plaintiff and were designed to unlawfully obtain title to the subject property, to the detriment of the Plaintiffs and they were done without reference to a lawful exercise of the lawful rights of the Defendants.

6. The Second Assignment of Deed of Trust, Dated August 27, 2013 whereby BANK OF AMERICA, NA assigned the Deed of Trust to a third party, NATIONSTAR MORTGAGE, LLC, without having been previously assigned the mortgage, is a violation of Title 18, US Code § 891-894, Extortionate Credit Transactions and a violation of Title 18, US Code § 1962(a) and a violation of Title 15 US Code §§ 1692e, misrepresentation and 1692f, unfair practices, see **Exhibit C**, attached and incorporated by reference. The second assignment of the Deed of Trust

without standing was done by BANK OF AMERICA, NA at a time when the Deed of Trust was not assigned to them. As a result, the second Assignment of Deed of Trust was a predicate Act of Racketeering and is an Extortionate credit transaction in violation of Title 18, US Code §§ 891-894. The above-described assignment alleged executed by a BANK OF AMERICA, NA executive and was intentionally calculated to deceive the Plaintiffs and to misrepresent themselves as creditors. This was done in order to collect the debt twice. These predicate acts and activities misled the Plaintiff and were designed to unlawfully obtain title to the subject property, to the detriment of the Plaintiffs and they were done without reference to a lawful exercise of the lawful rights of the Defendants. In the above-described first Assignment of Deed of Trust Talisha Wallace falsely describes herself as a MERS executive, with no evidence of any management responsibilities, or an appointment from MERS Board of Directors as an Assistant Secretary. Clearly this is a forgery, since MERS has no offices in Ventura County California, while Bank of America, NA has a large campus in that region of California.

7. There have been multiple violations of mail fraud and wire fraud pursuant to Title 18, US Code, §§ 1341 and 1343 related to the double recovery, and the unlawful foreclosure, which is unlawful in the context of the payment by the insurance carrier of a claim for mortgage insurance.

8. The racketeering acts are continuing and related, since they are all designed to foreclose on the subject property and to obtain possession of the subject property unlawfully. There is an ongoing effort by the defendants to obtain unlawful possession of the subject property.

9. The Defendants violated the RICO statutes, specifically Title 18, US Code, §§ 1962(a), 1962(c) and 1962(d) and 891-894 by billing the Plaintiff for an interest rate and finance charges that violate the Truth in Lending Act.

10. This loan Failed the TILA Finance Charge Test 12 CFR 10.26.18(d)(1) transferred from 12 CFR § 226. 18(d)(1). The Finance Charge is $ 733, 169.95, The disclosed finance charge is 324,000.00, which is not considered accurate because it is understated by more than $ 100.00. The excessively high finance charges and unlawful interest rates were used as a way to make it impossible for the Plaintiffs to repay the loan and to force them into a default. These acts of charging excessively high interest rates and double the stated finance charges are predicate acts of racketeering and carefully crafted to take control and possession of the Plaintiffs home in spite of the fact that the Defendants were never a mortgage creditor and were all strangers to the mortgage transaction.

11. This loan failed the TILA foreclosure rescission finance charge test, 12 CFR 10.26.23(h) transferred from 12 CFR § 226. 23(h). The finance charge is $733, 169.95. The disclosed finance charge is 324,000.00, which is not considered accurate because it is understated by more than $ 35.00.

12. This loan failed the TILA APR finance charge test, 12 CFR 10.26.22(a)(2) transferred from 12 CFR § 226. 23(h). The annual percentage rate is 10.174%. The disclosed APR is 3.625%, which is not considered accurate because it is more than 1/8 of one percent above or below the APR as determined by the actuarial method.

13. As an inducement to procure this loan the lender ignored and/or never verified the income of the borrower. By failing to use reliable income information, the DTI (Debt to income Ratio is more than 44%, causing a payment shock to me as the borrower. If an underwriter had

1  properly evaluated the loan, there would be no question about the borrower's capacity to repay
2  the loan.

3

4                                    II. PARTIES

5                                **Parties/ Plaintiffs**

6

7       14. We, The Plaintiffs are Ronald Cook and Christine Cook, are the lawful owners of the
8  property at 595 Center Drive, Severna Park, Maryland. We discovered that we were paying for
9  mortgage insurance, which is identified as LPMI in the monthly Billing statements from
10  NATIONSTAR MORTGAGE, LLC. We realized that our monthly payments included mortgage
11  insurance and, therefore the threatened foreclosure is a predicate act of racketeering and that the
12  foreclosure, even though the Defendants had collected mortgage insurance from our monthly
13  mortgage payments and subsequently filed a claim with one of the major mortgage insurance
14  carriers coupled with other predicate acts, described above, are not lawful and constitute a
15  pattern of racketeering activity.
16

17      15. The double recovery that resulted is one of several predicate acts of racketeering. The
18  assignments of the Deed of Trust by those who are not assignees and, in the case of the first
19  assignment of Deed of Trust, was done after the dissolution of the original lender,
20  COMMUNITY LENDING INC., when MERS could no longer claim to be an agent of
21  COMMUNITY LENDING, INC., and, as discussed above never had a power of attorney to
22  Assign the Deed of Trust. As a result, this first assignment of Deed of Trust was a major
23  predicate act of racketeering.
24

25      16. The Second Assignment of Deed of Trust was also signed by a stranger to the
26  transaction, since the first assignment of Deed of Trust was executed by a BANK of America,
27  NA executive, although there is no prior Assignment of Deed of Trust from The Bank of New
28

Complaint For Civil RICO                                                            7

York Mellon. The second assignment of Deed of Trust is also a predicate act of racketeering designed to deceive the Plaintiff and the public into believing that the assignee is NATIONSTAR MORTGAGE, LLC, so that NATIONSTAR MORTGAGE, LLC could violate Title 15, US Code, § 1641(f), prohibiting the loan servicers from acting as an assignee of the Deed of Trust for administrative convenience. **Part of the reason these predicate acts form a pattern of racketeering activity is that the recordation of the Assignments of the Deed of Trust and the Substitution of Trustee involved the use of false statements and misrepresentation of their status as signers and as a party that has standing**. In addition, the correspondence from the Defendants warning us of their intention to foreclose is also part of the same pattern of misrepresentation and deception because, in part they have a mortgage insurance policy in place to pay the unpaid portion of the mortgage, so there is no need to foreclose.

## Parties/ Defendants

17. The Chief and principal Defendant, who plans, sets policy, organizes and directs the activities of the other Defendants in the racketeering enterprise is THOMAS K. MONTAG, Chief Operating Officer, at BANK OF AMERICA, NA. BANK OF AMERICA, NA became the Master Loan Servicer of THE STRUCTURED ASSET MORTGAGE INVESTMENTS II TRUST MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2006-AR-1., when BANK OF AMERICA, NA purchased COUNTRYWIDE HOME LOANS. All of the Assignments of the Deed of Trust were signed by BANK OF AMERICA, NA employees or executives. The Defendants are operating and managing a racketeering enterprise through the use of the courts, the administrative process, correspondence and agents. The steps that were taken to foreclose were carefully calculated to cover up the defects in the assignment of the mortgage and to avoid

addressing issues related to standing and capacity of the alleged mortgage creditor in this matter. The policies of the racketeering enterprise were carried into effect by the other Defendants especially MICHELLE SJOLANDER, Senior Vice President at B of A. PATRICK BOWMAN, is the Vice President of Foreclosure at NATIONSTAR MORTGAGE, LLC, who carries out the foreclosure policies and practices of NATIONSTAR's. clients, in this case BANK OF AMERICA, NA. THE BANK OF NEW YORK MELON, hereinafter, BONY, is the Trustee of the above-described REMIC, and has taken direction from the Master Servicer, BANK OF AMERICA, NA. The law firm and their lead attorneys, named above, have also carried out the policies of the enterprise at the Direction of the Senior management of Bank of America, NA.

18. COLLEGIATE CAPITAL PARTNERS, LLC and their senior management, PATRICK W. HANSEN assisted the other Defendants in their efforts to achieve an unjust enrichment and double recovery by way of the foreclosure sale after having received a payment for the mortgage insurance claim from their mortgage insurance carrier.

19.   Obviously, these indisputable facts, as memorialized in the *Wall Street And The Financial Crisis, Majority And Minority Staff Report, Permanent Subcommittee On Investigations, United States Senate,* which Plaintiffs fully incorporate in their complaint by reference, were of little concern to the Defendants because they intended to realize *enormous profits so great from selling their loans to REMICS and receiving income from mortgage insurance products that would* render such interest collected on just servicing their bogus mortgage loans, negligible by comparison.

20.   Part of the reason the Defendants' multi-faceted criminal scheme has gone so largely unnoticed for such a protracted period, *is that it* victimized so many unsuspecting homeowners, created havoc on U.S. Courts, and defied the adage that "crimes do not pay" by netting hundreds of billions, if not trillions, of dollars for the perpetrators thereof, and its

sophistication is beyond the imagination of average persons. *The scope and complexity of the profits from this enterprise were invisible to the average person.* Similarly, beyond the imagination of most persons was, and is, the scope of the DISHONESTY of the Defendants and those acting in furtherance of their multi-faceted criminal enterprise, including the present Defendants themselves.

21.    Since its inception in 1999 or thereabouts through the present time, persons acting within the ambit of the Defendants' unprecedented RICO conspiracy, most particularly the Defendants herein, continued to operate consistently with the core principles of dishonesty and *obfuscation, which was* engendered by the original conspirators, among them the dubious duo, THE BANK OF NW YORK MELLON and BANK OF AMERICA, NA.

22.    The dark influences of this dubious duo have been spreading throughout the financial services, lending and banking industries into the national economy and beyond, threatening the very economic stability of the United States, if not that of the whole world.

23.    Because of the threat of continuing criminal acts of fraud and deception, the Defendants' past and present conduct in falsifying millions of mortgage artifices in furtherance of their multi-faceted enterprise, and that most of their claims in foreclosure cases have been based on intrinsic fraud, Plaintiffs urge this Honorable Court in the strongest possible way to apply a presumption of FALSITY when reviewing any documentary evidence filed or presented in any legal proceeding by any of the Defendants. *The threat of continuing criminal acts related to the Plaintiff's loan documents and probable foreclosure makes this foreclosure an open-ended pattern of racketeering activity that was started at least as far back as November of 2008 and continues to the present. The actions taken by the Defendants and all of them constitute a series of predicate acts, including a fraudulent Assignment of Deed of Trust scheme, fraudulent demands for payment that constitute a pattern of racketeering activity that are related by a*

*common purpose and actions taken by an association-in-fact enterprise, and those working under NATIONSTAR MORTGAGE, LLC, BANK OF AMERICA, NA and THE BANK OF NEW YORK MELLON or at the direction of BANK OF AMERICA, NA or subsidiaries and agents. The common purpose involved in each of the predicate acts is to create an artifice of flawed and fraudulent documents to give the appearance that THE BANK OF NEW YORK MELLON has the standing to enforce the note and deed of trust executed by the Plaintiff with COMMUNITY LENDING INC., and to subsequently collect the mortgage payments even though they are not entitled to collect monthly mortgage payments and foreclose on the plaintiff's home even though NATIONSTAR MORTGAGE, LLC does not have any connection to the note and deed of trust executed with COMMUNITY LENDING, INC., and they lack a chain of title to the note and deed of trust and they lack a property interest in the note and deed of trust. Thus the defendants cannot foreclose and cannot exercise any legitimate powers of enforcement of the note and Deed of trust.*

24.     Such a presumption is not just warranted; it is indeed compelled by the extent to which the Defendants, and those with whom they are associated, have long been acting in a malicious and wanton manner turning the truth into a lie in most documents filed or presented in U.S. Courts, evincing complete contempt for the judicial process itself, and shamelessly disregarding the rights of persons having interests contrary to their own. *The documentation of the fraudulent paperwork has come from the County Recorders Office, some of whom have conducted research and commissioned studies on the fraud and violation of the law. This includes Phil Ting, the County Recorder in San Francisco, who commissioned a study by a Respected Southern California Research firm AEQUITAS, who published their research in a Report called Foreclosure in California, a crisis of compliance, in which they showed that the banks violated the law 84% of the time when they foreclosed on homes. It appears that the banks*

*have exercised undue influence over the state courts because these unlawful practices are being*

*ignored by the state court judges.* Plaintiffs' foregoing characterization is particularly true

because the Defendants' continued contempt for due process, procedural due process, and other

applicable constitutional protections, is compounded by their specific intention to obviate the

longstanding traditional requirement that documents prepared for legal use be truthful, authentic,

and legitimate.

III.    JURISDICTION AND VENUE

25.     This Honorable Court has subject matter jurisdiction over this action pursuant to

18 U.S.C. § 1964. Jurisdiction may also be conferred based on diversity or supplemental

jurisdiction, and the holdings of the U.S. Supreme Court in <u>Tafflin v. Levitt</u>, 493 U.S. 455

(1990), and the U.S. Court of Appeals for the Ninth Circuit in <u>Lou v. Belzberg</u>, 834 F.2d 730, hn.

4 (9th Cir. 1987). (State courts have concurrent jurisdiction of civil RICO claims). *Defendants*

*have engaged in interstate commerce through fraudulent and deceptive lending practices across*

*state lines in the matters described below, in violation of the laws of the United States and*

*California.*

26.     Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28

U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district and

have done business in this district or in some cases reside in this district. Note that Section

1965(b) of the Federal RICO Act provides that process may be served in "any judicial district of

the United States" when required by the "ends of justice." Courts have held that such

"nationwide service of process" provisions also confer personal jurisdiction over a defendant in

any judicial district as long as the defendant has minimum contacts with the United States.

Finally, the statute provides a right of action by any injured party.

27.     Section 1962(c.) and (d) of the Federal RICO Act creates a private right of action for any "person" who has suffered a compensable injury. The term "person" has been interpreted liberally to include natural persons, partnerships, joint ventures, corporations, and governmental entity suing for its own injuries. Plaintiffs have been injured in their business and property by the Defendants' illegalities; therefore, they bring this civil action against the Defendants, their co-conspirators, and unknown co-conspirators for the fraudulent and deceptive practices they have been perpetrating pursuant to their multi-faceted criminal enterprise as follows:

IV.     THE DEFENDANTS' MORTGAGE LOAN SECURITIZATION SCHEME
        RELATIVE TO THE SUBJECT PROPERTY

28.     In the past ten (10) years, millions of residential mortgages have been bundled together, often in groups of 5,000, and investors were offered the opportunity to buy shares of each bundle.

29.     Each bundle of residential mortgages was given a name, such as "XYZ Home Loan Trust 2000 ABC-2." The name indicates the information about the particular trust such as the year the trust was formed (2000) and its contents (with ABC indicating by whom the loans in that particular trust were originally made).

30.     The Home Loan Trust has a Pooling and Servicing Agreement (PSA). The PSA sets forth what happens after the mortgages are bundled together. The PSA also sets a Cut-off Date. The Cut-off Date is the date on which all the mortgage loans in the trust must be identified. In short, a final list of all the mortgage loans in the trust is set out.

31.     Under the PSA, the Originator sold the bundle of mortgage loans to an entity

known as a "Depositor." The Depositor then sold the bundle of mortgage loans to an "Underwriter," the company that issues the certificates that show that the investors hold a beneficial interest in the trust. In short, the mortgage loans are gone from the Originator to the Depositor to the Underwriter of the Trust.

32.     Each trust has a closing date, which is the date that the individual mortgages are transferred to the Trust Custodian, who must certify that for each mortgage, the custodian has a mortgage note and/or proof that the ownership of the note has been transferred. This proof is most often an Assignment of Mortgage or deed of trust. Most trusts include the following or equivalent language regarding the Assignment: "Assignments of the Mortgage Loans to the Trustee (or its nominee) will not be recorded in any jurisdiction, but will be delivered to the Trustee in recordable form, so that the mortgage loans can be recorded in the event recordation is necessary in connection with the servicing of a Mortgage Loan."

33.     Some of the mortgage loans in the Home Loan Trust, also known as a REMIC, inevitably go into default and eventually foreclosure. The Trustee claims in the foreclosure action that it has acquired the loan from the Originator. However, the Trustee never mentions the intervening transfers (i.e., the many times that the said loan has been sold to other parties), and never proves that such transfers lawfully occurred. In the rush to form these trusts and sell them to investors, or in a deliberate attempt to cheat investors, the Assignments were never prepared, filed, and recorded. However, the Defendants' failure to prepare, to file, or record the Assignments, according to the PSA, *means that the entity seeking foreclosure can never prove the chain of ownership and title to the note and deed of trust of mortgage*. In such cases, much of the time, the Originator retains the right to service the loan for a fee. The homeowner has no idea that he is corresponding, negotiating with, or making his loan payments to a loan servicer instead

of the owner of the loan himself. More despicably, the Homeowner is NEVER involved either in the formulation of the "Unconscionable" REMIC nor the "Undisclosed" Securitization Process that technically turns over the security interest in his property to other parties, and, even more egregiously, his name and property are NOT even mentioned in either the PSA itself and/or other relevant securitization documents. And, to compound the malfeasance, the Homeowner has not even signed the Securitization Documents themselves and never read and/or negotiated the terms of the Deed of Trust that assigns all the profits to the Defendants and the losses to the homeowner.

34.     Under the purported securitization process, in which the name, signature, and property address of the homeowner are excluded, as long as the homeowner was making his mortgage payments in a timely manner, all was well. However, when widespread defaults started occurring in 2007 or thereabouts, the Trustees, Loan Servicers, and the Attorneys began to discover in the foreclosure process that the original Assignments could not actually be located, or that certain states, like Massachusetts, did not allow blank Assignments or Assignments with retroactive effective dates as valid assignments supporting a documented chain of title. To solve the problem of missing Assignments, which rendered those mortgages fatally flawed because of the bifurcation of the note, the trustees, their attorneys, and loan servicers began to fabricate and file new Assignments. These new Assignments were signed and notarized in an attempt to reverse engineer the assignments, and fabricate a chain of title years after the assignments were required to be recorded, as required under Title 26, USC, §§ 860D and 860G. This made the assignments appear in the county records many years after the actual transfers were required to take place in contravention to the Supreme Court ruling in Carpenter v. Logan, 83 U.S. 271 (1873) - that declares the Deed of Trust or mortgage a nullity without the Note.

35.     Those fraudulent Assignments were being prepared by specially-selected firms and companies that specialize in providing "mortgage default services" to banks and mortgage servicing companies. For instance, in Florida, a state with a mortgage default rate of more than 80 percent of the Mortgage Assignments filed in the last three years had been prepared, filed, and notarized by the same five or so law firms and default processing companies. From Florida, and other States such as California and Nevada, the fraudulent practice proliferated into a national phenomenon wrecking havoc on millions of homeowners and the U.S. court system of every state, especially California, with non-judicial foreclosure laws.

36.     Repeatedly, two Assignments were prepared, notarized, and filed by mortgage servicers to purportedly cure the missing assignment, which rendered millions of mortgages null, void, or unenforceable, if not null, void, or unenforceable ab initio. The first assignment was prepared in the name of one entity as "nominee" for the particular bank or mortgage servicing company. When the first entity's authority to file foreclosures and Assignments was challenged by a court, another Assignment was prepared in the name of the second entity, B OP A.

37.     In all these cases, as described above, the Assignment was prepared, and is prepared nunc pro tunc: to conceal the actual date that the property was originally acquired by the Trust. A close examination of the Assignments filed showing the grantee as the Trust — such as "XYZ Home Loan Trust 2006 — ABC 2" — shows that most of these Assignments were prepared, notarized, and filed between 2008 and 2009, when, in reality, the mortgages and Assignments were actually assigned prior to the closing date of the Trust, which is noted in the PSA. While the actual closing date of the Trust can only be determined by looking at the trust or securitization documents themselves, any Trust that includes the year 2006, or any other year in

1    its title, actually closed in 2006 or in the particular year noted in its title.

2    38.    Therefore, if a Mortgage Assignment is dated, executed, notarized, and filed in a
3
     year after the year set forth in the name of the REMIC on the Assignment, it is actually an
4
     Assignment specially, and in most cases, fraudulently, made nunc pro tunc — or now for then —
5
6    to facilitate an unlawful foreclosure by a non-party mortgage servicer.

7    39.    These Specially-Made Assignments have wreaked havoc on every level of the US
8
     judicial system. In most cases, these fraudulent Assignments are dated AFTER the foreclosure
9
10   action has been initiated, making it appear that the Trust somehow magically knew prior to the
11   fabrication of the Assignment that it would acquire the defaulting property several months after
12   the foreclosure action had been initiated.

13   40.    Repeatedly, courts have asked Trustees to explain why they were acquiring non-
14
     performing loans and whether such acquisition was in violation of the trustee's fiduciary duty to
15
16   the Trust. Thus far, no trustee has ever come forth to explain that the Trust actually acquired the
17   loan years before the Assignment.

18   41.    In short, according to the U.S. Securities and Exchange Commission ("SEC"):
19
20   "Mortgage-backed securities ["MBS"] are debt obligations that represent claims to the cash
21   flows from pools of mortgage loans, most commonly on residential property. Mortgage loans
22   are purchased from Defendants, mortgage companies, and other originators. These mortgage
23   loans are later assembled into pools by a governmental, quasi-governmental, or private entity.
24   The entity then issues securities that represent claims on the principal and interest payments
25   made by borrowers on the loans in the pool. This process is known as securitization." SEC,
26   "Mortgage-Backed       Securities"      (June      25,      2007)      (http://www.sec.gov/answers/
27

28
─────────────────────────────────────────

mortgagesecurities.htm).

42.     Under California's and federal consumer-protection laws, the Defendants are prohibited from engaging in unfair or deceptive practices with respect to consumers as to the securitization of their mortgage loans into trusts.

43.     In the course of their securitization of Plaintiffs' mortgage loan relative to the subject property, the Defendants originated Plaintiffs' mortgage loan on December 15, 2005, in the name of, and assigned said mortgage to, COMMUNITY LENDING, INCORPORATED., a non-existent entity and, as discussed above, an entity that had been out of existence since March 2, 2009, and could not transact business in California pursuant to California Civil Code section 1558. COUNTRYWIDE HOME LOANS then purchased the loan and proceeded to create a REMIC to position the REMIC as an investment trust, to contrive a transfer of Plaintiffs loan into a securitization scheme under the false pretenses of a REMIC. Then, they bifurcated the Note from the Deed, thus rendering it null or void ab initio, according to the U.S. Supreme Court, in Carpenter v. Longan, Supra, and used Plaintiffs' Promissory Note as a deceptive, manipulative, and fraudulent device in contravention to securities fraud laws by duplicating and selling, and allowing other co-conspirators to duplicate and sell, the said Promissory Note repeatedly to known and countless unknown co-conspirators to the benefit of Defendants' enterprise and that of the Defendants' co-conspirators respective enterprises. The Plaintiffs discovered the multiple and serial assignment of the loan to REMICS, with the use of a securitization expert, who identified these alleged transfers of the note from a sophisticated Data base, designed to discover the assignment of mortgages and deeds of trust, see **Exhibit D,** attached and incorporated by reference. The Defendants created a sham deed of trust and cloaked the failed and "Undisclosed Securitization" of their loan, a process in which Plaintiffs did not

1  participate, and was done without their consent. COUNTRYWIDE HOME LOANS and agents,

2  failed to assign Plaintiffs' mortgage loan into the Securitized Trust before the Cut-off date in

3  contravention to the PSA, and in violation of Title 26 US Code, §§ 860D and 860G, thereby

4  rendering such transfer ineffective and void. The Defendants used documents related to the

5  foreclosure, particularly the Substitution of Trustee and an Assignment of Deed of Trust with a

6  signature of alleged agents of the original lender that were executed after the original lender,

7
8  COMMUNITY LENDING, INC., was out of business and had dissolved their corporation and

9  could not have granted permission to the document signers to act as an agent under a power of

10  attorney. They attempted to use an Assignment of Deed of Trust, which is a nullity absent of a

11  Corporate Resolution, Power of Attorney, or other supporting documentation.  They attempted to

12  use as foreclosing entity, a law firm in Maryland, Alba Law Group, P.A. to execute and file other

13  deceptive foreclosure documents, such as the Notice of Default and Notice of Trustee Sale, in

14  contravention to the provisions of Plaintiffs' SI. At the time that these documents were executed

15
16  neither BANK OF AMERICA, NA, nor THE BANK OF NEW YORK MELLON nor

17  NATIONSTAR MORTGAGE, LLC nor any of the Defendants was the true owner of the loan

18  because its chain of ownership had been broken by a defective transfer of, and/or failure to

19  transfer, the mortgage loan to the securitized trust as discussed above. The Defendants then

20  attempted the failed transfer after the closing date of the securitized trust holding the pooled

21  mortgages and therefore the transfer was ineffective. More significantly, the signer of the

22
23  Substitution Of Trustee, and the signer of the Assignment of Deed of Trust, is not authorized to

24  execute said documents because Plaintiffs' SI confers the right to substitute the trustee

25  exclusively to the purported Lender/Beneficiary, which was COMMUNITY LENDING

26  INCORPORATED, which was a dissolved corporation at the time of the signing of the two

27  Assignments of the Deed of Trust. A telephone call to the California Secretary of State

28

Confirmed that COMMUNITY LENDING INC. was effectively dissolved when the California Franchise Tax Board formally suspended their operations on March 2, 2009. The Defendants attempted to use a foreclosing entity, which is not authorized to accelerate said mortgage or foreclose on said mortgage loan as the SI confers the right of acceleration exclusively to the purported Lender/Beneficiary, which is COMMUNITY LENDING, INCORPORATED, a non-existent entity, as discussed above. The Trustee assigned the note thereof in blank or without an assignee and bifurcated it from the Deed of Trust, thereby rendering the said note void ab initio pursuant to U.C.C. and the Supreme Court ruling in Carpenter v. Logan as previously mentioned, that calls for the Note to be affixed to the Deed of Trust as if the two Documents were one. The Defendants failed to deliver the Note to the Trustee as required under UCC §3-203 (a) An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument, and under subsection (b) Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any rights of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument." The Defendants, by bifurcating the note, have violated this U.C.C. provision and the doctrine of clean hands by engaging in intrinsic fraud again and again...all their illegalities also in contravention to the U.S. Supreme Court, in Carpenter v. Longan, 83 U.S. 16 Wall. 271 271 (1872), that held,"The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity." Therefore, the Defendants never did, and can never, acquire rights of a holder-in-due-course by the transfer, directly or indirectly, from the holder in due course. To compound their fraudulent scheme, the Defendants later demanded and

1  collected monthly payments, late charges, and other fees — to which they are not entitled, after

2  assigning or selling the so-called mortgage loans to countless entities, known and unknown,

3  collecting their face values time and time again under the terms of multiple insurance policies,

4  including the CREDIT DEFAULT SWAPS, aka CDS, government-sponsored insurance, and

5  other private insurance policies that, supplied the Defendant BANK OF AMERICA, NA,

6  NATIONSTAR MORTGAGE, LLC and the enterprise, with multiple sources of payment in full

7
8  of the subject loan, so that any attempt to collect further payments of the loan from the Plaintiffs

9  and their ongoing pursuit of a foreclosure is an attempt at double recovery. These various forms

10  of insurance protected the Defendants from all losses from loan default, and perpetrated other

11  criminal acts that deprive homeowners of their property, in the form of the monthly mortgage

12  payments paid to the Defendant NATIONSTAR MORTGAGE, LLC, and the subsequent

13  foreclosure process, which further deprives the Plaintiffs of their home. Neither BANK OF NEW

14  YORK MELLON, NA nor BANK OF AMERICA, NA nor NATIONSTAR MORTGAGE, LLC

15
16  is entitled to receive the monthly mortgage payments because they are not creditors, as

17  discussed, and such actions to collect mortgage payments, as non-creditors, and to subsequently

18  foreclose are all predicate acts of racketeering activity that involved careful planning, a

19  systematic operation and ongoing management with the intent to deceive the Plaintiffs regarding

20  their falsified status as creditors. This violates Federal Civil Rico law and, primarily, the Fourth,

21  Fifth, and Fourteenth Amendments of the U.S Constitution, and the Supremacy Clause thereof,

22
23  that guarantee Plaintiffs' right to be secure in their property, and protect their property from

24  unreasonable seizure.

25
26
27
28

FIRST CAUSE OF ACTION

**Conduct and Participation in a RICO *Enterprise***

**Through a *Pattern of Racketeering Activity*:**

**(18 U.S.C. §§ 1961(5), 1962(c))**

43.     Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

44.     At various times and places partially enumerated in Plaintiffs' complaint, all Defendants were "persons" as defined by 18 U.S.C. §1961[3]. Defendants engaged in a pattern of racketeering activity by the series of related predicate acts that formed the basis for the racketeering activities through their enterprise, an association-in-fact.

45.     At various times and places partially enumerated in Plaintiffs' complaint, all Defendants did associate with a RICO *enterprise* of individuals who were associated in fact, and who engaged in, and whose activities did affect, interstate and foreign commerce.

46.     Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering activity*, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

47.     During the ten (10) calendar years preceding November 4, 2013, all Defendants did cooperate, jointly and severally, in the commission of two (2) or more RICO predicate acts that are itemized in the RICO laws 18 U.S.C. §§1961 (A) (B), and did so also in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

48.     Plaintiffs further allege that all Defendants did commit two (2) or more offenses itemized above at in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c) supra.

49.     Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this Honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however. *Respondeat superior* (as explained above).

The Predicate Acts

50.     Defendants' systematic scheme to fraudulently conceal assessment of unlawfully marked-up fees on the accounts of borrowers who have mortgage loans administered by the Defendants, as described above, which was facilitated by the use of United States Mail and wire, constitutes "racketeering activity" within the meaning of Title 18 USC 1961(1) as acts of mail fraud and wire fraud under Title 18 USC 1341 and 1343, respectively and as an act of engaging in extortionate credit transactions in violation of Title 18 USC §891-894.

51.     In violation of Title 18 USC sections 1341 and 1343, the Defendants utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by them by obtaining money from borrowers using false or fraudulent pretenses. In addition, the Defendants attempted to collect a debt that is not owed to them and to foreclose on the Plaintiffs primary residence without standing and at the same time collected a claim for a mortgage insurance policy, see Exhibit XX, attached and incorporated by reference.

52.     Through the mail and wire, Defendants provided mortgage invoices, loan statements, or proofs of claims to Plaintiffs, demanding that Plaintiffs and other borrowers pay fraudulently concealed marked-up and/or unnecessary fees for default-related services, such as

BPOs and Lender-placed Insurance.

53.     Defendants fraudulently and unlawfully marked-up fees in violation of borrowers' mortgage agreements because the fees exceed the actual cost of the services, and therefore, they are not, as the mortgage agreement require, "reasonable" or "appropriate" to protect the note holder's interest in the property. Defendants' assessment of fees that were unnecessary are also unlawful because unnecessary fees are not, as the mortgage agreement require, "reasonable" or "appropriate" to protect the note holder's interest in the subject property.

54.     The mortgage invoices, loan statements, or proofs of claims provided to borrowers fraudulently concealed the true nature of assessments made on borrowers' accounts. Using false pretenses, identifying the fees on mortgage invoices, loan statements, or proofs of claims only as "Lender Placed Insurance," "Other Charges," "Other Fees," "Miscellaneous Fees," or "Corporate Advances" to obtain full payments from borrowers, Defendants disguised the true nature of these fees and omitted the fact that the fees include undisclosed mark-ups and/or were unnecessary.

55.     Furthermore, to lull borrowers into a sense of trust, conceal Defendants' unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme from borrowers by telling them, in statements and other documents, that such fees are "allowed by [borrowers'] Note and Security Instrument," or that they are "[i]n accordance with the terms of your mortgage." The Defendants NATIONSTAR MORTGAGE, LLC also charged an interest rate that was far in excess of the stated interest rate and finance charges that are far in excess of the stated finance charges.

56.     Each of these acts described above constituted an act of mail fraud for purposes of Title 18 United States Code section 1341.

57. The Defendants used the internet, telephone, and facsimile transmission to fraudulently communicate false information about these fees to borrowers, to pursue and achieve their fraudulent scheme, Defendants engaged in repeated acts of wire fraud in violation of Title 18 United States Code section 1343.

58. In an effort to pursue their fraudulent scheme, Defendants knowingly fraudulently concealed or omitted material information from plaintiffs. Defendants' knowledge that their activities were fraudulent and unlawful is evidenced by the fact that they did not disclose the mark-ups and/or unnecessary nature of the fees in their communications to Plaintiffs and borrowers. They also did not give notice of the date that they filed the mortgage insurance claim and collected money from said claim.

59. Additionally, the Defendants, directly or indirectly, engaged in thousands of acts and threats that are chargeable under provisions of title 18 USC, including, but not limited to, section 659 (relating to theft from interstate shipment and fraud and related activity in connection with access devices); section 1344 (relating to financial institution fraud); section 1951 (relating to interference with commerce, robbery, or, extortion); section 1952 (relating to racketeering); section 1956 (relating to laundering of monetary instruments, including Promissory Notes and other Mortgage Artifices; engaging in monetary transactions in property derived from specific unlawful activities); sections 2314 and 2315 (relating to interstate transportation of stolen property) and engaging in an act involving extortionate credit transactions in violation of Title 18 USC §891-894.

56. The Defendants, directly or indirectly, have also been engaging in numerous acts and threats that are chargeable under provisions under State law punishable by imprisonment for more than one year; acts that are indictable.

57.     The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of Tile 18 USC 1961(5) in which Defendants have engaged under Title 18 USC section 1962(c).

58.     All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Defendants' racketeering enterprise.

59.     The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Honorable Court enjoins the racketeering activity.

60.     Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

61.     As a direct and proximate result of these violations of Title 18 USC section 1962(c), Plaintiffs have suffered damages. Defendants are liable to Plaintiffs for treble damages, together with all costs of this action, plus reasonable attorneys' fees, as provided under Title 18 USC seciton1964(c).

62.     Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be liberally construed by this Honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  Respondeat superior (as explained above).


## SECOND CAUSE OF ACTION

### Conspiracy to Engage in a

### *Pattern of Racketeering Activity*:

### (18 U.S.C. §§ 1961(5), 1962(d))

**63.     Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.**

64.    At various times and places partially enumerated in Plaintiffs' complaint, all Defendants were "persons" as defined by 18 U.S.C. §1961[3].

65.    At various times and places partially enumerated in Plaintiffs' complaint, all Defendants did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(b) and (d).

66.    At various times and places partially enumerated in Plaintiffs' complaint, all Defendants did also conduct and participate in said RICO enterprise through a pattern *of racketeering activity*, in violation of 18 U.S.C. 1962(c) and (d). See also 18 U.S.C. §§ 1961(4) (5) and (9).

67.    During the eight (8) calendar years preceding June 7, 2013, all Defendants, except for COLLEGIATE CAPITAL ADVISORS, LLC and PATRICK HANSEN did cooperate, jointly and severally, in the commission of two (2) or more of the predicate acts that are itemized at 18  §§ 1961(1) (A) an (B), in violation of 18 U.S.C. 1962(d).

68.    Plaintiffs further allege that all Defendants did commit two (2) or more offenses itemized above in a manner, which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d). (Prohibited activities supra).

**69.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this Honorable Court. Said construction rule was never codified in Title 18 of the United States Code, however. *Respondeat superior* (as explained above).**

1
2
3                                 THIRD CAUSE OF ACTION
4                                  CIVIL RACKETEERING
5            (18 U.S.C. § § 1961(5), 18 U.S.C. 1962(a) and 18 U.S.C. 1962(c), 1503)
6       70.    Plaintiffs incorporate by reference in this cause of action each and every
7
     allegation of the preceding paragraphs, with the same force and effect as though fully set forth
8
9    herein.

10      71.    At various times and places partially enumerated in Plaintiffs' complaint, all
11
12   Defendants were "persons" as defined by 18 U.S.C. §1961[3].

13      72.    At various times and places partially enumerated in Plaintiffs' complaint, all
14
     Defendants did associate with a RICO enterprise of individuals who were associated in fact, and
15
16   who engaged in, and whose activities did affect, interstate and foreign commerce.

17      73.    Likewise, all Defendants did conduct and/or participate, either directly or
18
     indirectly, in the conduct of the affairs of said RICO enterprise, an association-in-fact, *through a*
19
20   *pattern of racketeering activity*, all in violation of 18 U.S.C. §1961(4), (5), (9), and 1962(c),
21   1503.
22
        74.    During the eight (8) calendar years preceding June 7, 2013, all Defendants, except
23
24   for PATRICK HANSEN and COLLEGIATE CAPITAL ADVISORS, LLC did cooperate,
25   jointly and severally, in the commission of two (2) or more of the RICO predicate acts that are
26   itemized in the RICO laws at .§1961(1), (A), (B), and did so in violation of the RICO laws at 18
27   U.S.C. §§1962(c) 1503 (Prohibited activities).
28
                                 Complaint For Civil RICO                              28

75.    Plaintiffs further allege that all Defendants did commit two (2) or more offenses itemized above in a manner, which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(c) 1503 supra.

76.    The conduct of the members of the enterprise, an association-in-fact, which is a coordinated and planned operation of the enterprise using all of the Defendants, with assigned tasks and the Defendant's specialized skills and expertise of the Defendants as it relates to the illegal scheme, is for the most part directed by the syndicates referenced in detail in this entire complaint.

77.    This is the structure of the enterprise as it relates to the "money-in" component of the illegal scheme, as also set forth in this complaint.

78.    The Defendants orchestrated the siphoning of the stolen money in direct consultation and Association with terrorists, drug cartels, and unsourced money entities according to the Senate Report on *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History.*

79.    All Defendants as members of the enterprise, directly or indirectly, are participants in the illegal multi-faceted scheme in different capacities, functions, and roles calculated to enrich and expand the Enterprise so that it could continue to perpetuate its criminal activities against Plaintiffs and hundreds of thousands of similarly-situated homeowners nationwide.

80.     The enterprise governance occurred through frequent communications among its members by means of interstate and international wire communications via telephone, facsimile, Email, and other methods of communications, in interstate and foreign commerce, in additional to travel to and from California, Maryland and internationally, and other acts of lawlessness and malfeasance.

81.     The predicate acts form "a *pattern of racketeering activity*" and are all part of a common criminal plan in furtherance of, and to perpetuate, the Defendants' multi-faceted criminal scheme, clustering around, *inter alia,* the deceptive mortgage loan origination, processing, and securitization of said mortgages into a trust also known as a REMIC, unfair mortgage loan servicing practices; concealment of parties with constitutional standing and party-in-interest-status in millions of mortgage loans; intrinsic mortgage fraud by fabricating and filing of millions of mortgage artifices under the penalty of perjury to give the illusion of standing in millions of foreclosure and bankruptcy proceedings, including the foreclosure on the Plaintiffs home; prosecution of hundreds of thousands of unlawful judicial and non-judicial foreclosure cases nationwide, including attempted foreclosure on the Plaintiff's home; fraudulent mortgage loan modification and mitigation processes, including fraudulent loan modification on the Plaintiffs home; overcharging of foreclosure-related fees for services rendered including fraudulent overcharging for fees under the Plaintiff's home loan; charging homeowners' accounts for services not rendered including the Plaintiffs home loan account; notarial fraud; and substantial interference with the property rights and interests of Plaintiffs, including fraudulent notarizations on documents recorded and related to the Plaintiffs home loan in contravention to the Fifth Amendment of the Constitution of the United States of

1  America which guarantee, inter alia, "the right of the people to be secure in their persons,

2  houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

3

4        82.    All the above-mentioned acts and criminal conduct of the Defendants are

5  designed to enrich the Enterprise. In addition to being part of a common criminal scheme, as

6  alleged above, the predicate acts of the Defendants are interrelated, in that thy are part of a multi-

7  faceted criminal scheme, and share at least eighteen (18) other distinguishing characteristics in

8  that they: (i) were mortgage loans originated by COMMUNITY LENDING, INC., an entity that

9  was no longer in existence; (ii) have missing and/or non-existent promissory notes and

10  assignments; (iii) have already been assigned, transferred, or previously sold to investors in an

11  international Ponzi Scheme; (iv) have been assigned to multiple trusts; (v) have been paid time

12  'ime again under the terms of multiple insurance policies, FHA, the CDS or policies that

14  indemnify their lender from all losses, including non-payment of, and default on, loan; (vi) were

15  not properly assigned, or originally assigned in blank; (vii) were not assigned to the securitized

16  trust before the cut-off date in the PSA; (viii) contain the same fraudulent assertion as to THE

17  BANK OF NEW YORK MELLON being the beneficiary with standing when indeed THE

18  BANK OF NEW YORK MELLON has never been the beneficiary thereof; (ix) contain similar

19  language as to THE BANK OF NEW YORK MELLON being JP Morgan Chase Bank's

20  successor without any such evidence or, in the alternative, evidence that indicates otherwise; (x)

21  being claimed by parties with no legal standing to demand money and foreclose on the property

22  at bar; (xi) involve fraudulent substitutions of trustee and assignments; (xii) contain backdated

24  assignments, deeds of trust, and other mortgage artifices executed by robo-signers or third-

25  parties with no material knowledge of the contents thereof; (xiii) contain other fake documents

26  executed or notarized by robo-signers using fictitious corporate titles; have been executed and

27

28

notarized fraudulently under the penalty of perjury; (xiv) assignments signed by officers of the grantee fraudulently identifying themselves as officers of the grantor; (xvi) employment of fake documents, false officer titles, and forged signatures violative of federal and state lending laws, and state notary fraud laws; (xvii) brought by BANK OF AMERICA, NA, one of B of A's subsidiaries, and other criminal enterprise members; (xviii) and have as moving parties individuals, managers, network attorneys, law firms or foreclosure mills associated with RICO Defendant BANK OF AMERICA, NA and NATIONSTAR MORTGAGE, LLC.

83.    The Defendants have concealed the stolen property and other criminally derived proceeds of the illegal scheme since the aforementioned date upon which (a) had been broken and (b) the TARP program crossed the line of illegality and began being utilized for their profit individually and collectively until the present time. This concealment has continued unabatedly and in the face of reports by the FDIC, the Comptroller of the Currency, the Office of the Thrift and the United States Department of Homeland Security, and the Report of the Inspector General of the TARP program, in the only manner in which such concealment could continue in the face of contrary reports by various sources: Through lies told directly from the mouths of the Defendants and Enterprise Members and has been repeated even by Government Officials and the media in order to misrepresent the true facts to Plaintiffs and the citizens of the United States and their elected representatives.

84.    As American citizens have become knowledgeable of the foregoing scheme, the Defendants — and each of them — have engaged in extrinsic mortgage fraud and conversion in violations of State and Federal law, other acts chronicled as wrongful by the Office of the Inspector General of the Securities and Exchange Commission, and other Governmental Agencies.

85.     All of the predicate acts relate to one another because they represent a common scheme to further the illegal scheme, to hide the true parties of interest under the terms of millions of promissory notes, minimizing losses and maximizing profits, thereby defrauding hundreds of thousands of American citizens, including Plaintiffs, enrich the Defendants individually, and their Enterprise collectively.

86.     The predicate acts progressed in a logical fashion as the illegal scheme expanded from Maryland to other states and nations, supported by monies advanced to it even by drug cartels, terrorists, and the conversion of personal and real property of countless US citizens, including Plaintiffs, misappropriation of taxpayers' bailouts — from which RICO Defendants have received nearly billions of dollars, and ultimately Defendants' raid of the TARP Programs, and monies from other unknown sources with all Defendants herein assuring that all the Defendants, unknown and known, would have plausible deniability and governmental immunity from criminal prosecution through utilization of the foregoing fraudulent techniques often used by persons in power to corruptly stop enemies from exposing the truth.

87.     These acts of the Defendants, and each of them, including the use of fraudulently conveying and transferring money, constitute repeated and related predicate acts of . . . [i] money laundering in violation of 18 U.S.C. §1956; [ii] engaging in monetary transactions in property derived from specific unlawful activity in violation of 18 U.S.C. §1957; [iii] wire fraud in violation of 18 U.S.C. §1343; [iv] financial institution fraud in violation of 18 U.S.C. §1344; [v] mail fraud in violation of 18 U.S.C. §1341; [vi] interstate or international travel in violation of the travel act, 18 U.S.C. §1952; [vii] and an act of engaging in extortionate credit transactions in violation of Title 18 USC §891-894. The fact is that the objects of the fraud for purposes of this

1  claim for relief worsened and increase liability to the Defendants. These facts create additional

2  liability under 18 U.S.C. §1503.

3

4      88.     The multi-faceted criminal scheme would not have continued absent the influx of

5  money provided by the Defendants' illegal schemes, directly or indirectly, as alleged in detail

6  above, as well as their money laundering and drug cartel influxes of money also alleged above.

7  The effect of the collapse of the foregoing money laundering and racketeering schemes is a

8  matter of public record and a fact of which this court can take judicial notice including the recent

9  Senate Report on the money laundering and drug cartel activities of HSBC and resulting

10  admission by Defendant Holder in his official capacity that such unlawful money laundering

11  activities have spread to all banking institutions in the United States, including B of A and other

12  Co-defendants, and their offshore haven defendants. Defendants, directly or indirectly, used and

13  exploited U.S. Financial institutions, lawyers, accountants in California, New York, as well as

14  interstate and internationally via telephone, facsimile, Email, wire transfer, and other methods of

15

16  communications from 1999 or thereabouts until the present.

17

18      89.     As a direct and proximate result of the violations set forth above, Plaintiffs, and

19  hundreds of thousands of similarly-situated homeowners, have been injured in their business,

20  personal property, and in their real property and such injury is continuing.

21

22      90.     Plaintiffs are also entitled to the appointment of a receiver for an accounting to

23  recover the fruits of the frauds, parallel injunctive relief, an order that the Defendants and their

24  transferees (wherever located) disgorge and forfeit all of such monies and the fruits of their

25  fraud.  Such relief will require a finding by this Honorable Court that the acts and conduct of the

26  Defendants, and each of them, as alleged are in violation of the Hobbs Act U.S.C. § 1951),

27

28

which "prohibits actual or attempted robbery or extortion affecting interstate or foreign commerce", and conspiracy to violate the Hobbs Act (18 U.S.C. § 1951) at §371, which "proscribes conspiracy to commit robbery or extortion without reference to the conspiracy statute." These acts are also extortionate credit transactions in violation of Title 18 USC §891-894.

91.     The Defendants mentioned-above and mentioned-below, directly and indirectly, have committed "Extortion By Force, Violence, or Fear under Color of Official Right" by demanding and actually obtaining money from, and attempting to take property, from hundreds of thousands of homeowners, including Plaintiffs, whose property is located at 595 Center Drive, Severna Park, Maryland.

93.     Therefore, Plaintiffs ask this Honorable Court for a determination as to whether the activities and conduct of the Defendants, individually and collectively, as alleged above and below are violative of both the Hobbs Act (18 U.S.C. § 1951), which prohibits actual or attempted robbery or extortion affecting interstate or foreign commerce, and also conspiracy to violate (18 U.S.C. § 1951) at §371, "which proscribes conspiracy to commit robbery or extortion without reference to the conspiracy statute."

94.     Plaintiffs seek further an order halting the foreclosure of all real estate in the United States of America by any of the Defendants, until the full restitution and disgorgement has occurred in favor of Plaintiffs and against the enterprise members, which includes injunctions on any post-foreclosure activities throughout the country as well, all of which shall stop all foreclosure activity of any kind in States such as California, Florida, Ohio, Nevada,

1   Colorado, New Hampshire, New York, Iowa, Wisconsin, Michigan and all other states in which

2   the Banksters have continued their "reverse-run-on-the-bank."

3
4       95.     Plaintiffs further seek an emergency Temporary Restraining Order to take effect

5   immediately, and even *sua sponte* in the event this Honorable Court is so inclined.

6
7       96.     The Defendants' violations of 18 U.S.C. §1962[c] and 1503, including but not

8   limited to the double recovery discussed above, flawed and defective Assignments of the Deed

9   of Trust, executed without authorization from the original lender and with a gap in the chain of

10  title as discussed above, higher interest rates than are allowed under TILA, double the finance

11  charges that were quoted by the original lender and are the proximate cause of these losses.

12  Under the provisions of 18 U.S.C. §1964[c], Plaintiffs are entitled to bring this action and

13  recover herein treble damages, the cost of bringing this suit, prejudgment interest, and

14  recoverable attorneys' fees.

15
16      97.     Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above

17  are to be liberally construed by this Honorable Court.  Said construction rule was never codified

18  in Title 18 of the United States Code, however.  Respondent superior (as explained above).

19
20                          FOURTH CAUSE OF ACTION

21          (Unjust Enrichment, Insurance Fraud, Breach of Contract, Bad Faith)

22      98.     Plaintiffs incorporate by reference in this cause of action each and every

23  allegation of the preceding paragraphs, with the same force and effect as though fully set forth

24  herein.

25
26      99.     By their wrongful acts and omissions of material facts, Defendants were unjustly

27  enriched at the expense of Plaintiffs.

28

100.   The mortgage contract between Defendants and borrowers like Plaintiffs allows B OF A, NATIONSTAR, their officials, senior managers, subordinates, and agents to pay for default-related services when necessary or appropriate, and to be reimbursed by the borrower, but it does not authorize Defendants to mark-up the actual cost of those services to make a profit, nor does it allow Defendants to incur unnecessary fees.

101.   Nevertheless, Defendants mark-up the prices charged by vendors, lender-placed mortgage insurance, and other services rendered often by 100 percent or more, and then, without disclosing the mark-up, assess borrowers' accounts for the higher, marked-up fee so that Defendants can earn a profit.

102.   Thus, Plaintiffs were unjustly deprived *of property in violation of RICO statutes*.

103.   Defendants are aware that it is improper to mark-up and/or assess unnecessary fees on borrowers' accounts for default related services. Therefore, Defendants fraudulently conceal these fees on borrowers' accounts, omitting any information about Defendants' additional profits, by identifying them on mortgage statements only as "Other Charges," "Other Fees," "Miscellaneous Fees," or "Corporate Advances." Also, the billing for LPMI by the Defendants, the payment by the Plaintiffs for mortgage insurance and the payment by the insurance carrier of a claim for mortgage insurance coupled with the foreclosure constitutes double recovery, breach of contract, bad faith, insurance fraud and unjust enrichment.

104.   Furthermore, to lull borrowers into a sense of trust, conceal Defendants' unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme from borrowers by telling them, in statements and other documents, that such fees are "allowed by [borrowers'] Note and Security Instrument," or that they are "[i]n accordance with the terms of your mortgage."

105.   It would be inequitable and unconscionable for Defendants to retain the profit,

benefit, and other compensation they obtained from their fraudulent, deceptive, and misleading conduct alleged herein.

106.   Plaintiffs seek restitution from Defendants, and seek an order of this Honorable Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

## FIFTH CAUSE OF ACTION

### DECLARATORY AND INJUNCTIVE RELIEF AS TO THE PLANNED UNLAWFUL SEIZURE OF THE PLAINTIFFS PRIMARY RESIDENCE IN VIOLATION OF THE FEDERAL AND STATE LAWS CITED ABOVE, AND IN VIOLATION OF THE PROHIBITION AGAINST DOUBLE RECOVERY IN MARYLAND.

107.   All of the above Paragraphs of this complaint are hereby incorporated by reference as though fully set forth herein.

108.   Plaintiffs further ask this Honorable Court to take judicial notice of, and for a determination declaring, COMMUNITY LENDING INC's mortgage loan as described in the SI to be a sham, without any basis in fact, part of a multi-faceted Ponzi Scheme, and is therefore null, void, legally unenforceable, if not null, void, or unenforceable ab initio because, *inter alia*, Washington Mutual Bank, F.A., was a non-existent entity and, had been a non-existent entity since January 1, 2005. Therefore, the assignment of the so-called mortgage to Washington Mutual Bank, F.A., was a fraud ab initio. Additional reasons include:

109.   The plain language of the SI asserts at paragraph that:

**(B)**   **"Borrower"** is Ronald Cook and Christine Cook..." A borrower, however, is one who borrows money from a lender; whereas a lender is one who lends money to a borrower. However, there is absolutely no evidence in the SI itself, the final escrow

instructions, or anywhere else of any evidence of money lent by Washington Mutual Bank, F.A., to make it the Lender/Beneficiary. In the alternative, there is no evidence in the SI itself, the final escrow instructions, or anywhere else of any evidence of any money borrowed by Plaintiffs to make them the Borrowers. Although Plaintiffs on two separate occasions had asked Defendants, and each of them, to validate the so-called debt pursuant to RESPA 6, and other State and Federal full-disclosure Laws and Statutes, the Defendants have never provided any substantive response as to any proof that they are even the servicer of the so-called mortgage loan, entitled to enforce the provisions thereof in the name of the holder of due course, much less the holder of due course himself/itself. Plaintiffs allege that the Defendants, and each of them, are third-party entities who have banded themselves together in a multi-faceted criminal conspiracy to defraud Plaintiffs of the personal property and attempt to illegally seize their real property though an unlawful foreclosure. Plaintiffs further allege that the bifurcation of the Note, which is the only evidence of the debt, from the SI renders the debt null or void ab initio per Supreme Court ruling in Carpenter v. Logan supra.

110.    The plain language of the SI asserts at paragraph:

**(C)    "Lender"** is COMMUNITY LENDING INCORPORATED. Lender is a warehouse lender organized and existing under the laws of the State of California that was dissolved and suspended on March 2, 2009. However, Washington Mutual Bank, F.A., was not the Lender as alleged above.  Said suspension and dissolution of the original lender occurred before any assignments were signed and recorded in the county records making these assignments void ab-initio. The said mortgage loan is null or void and the provisions thereof are unenforceable if not null and void and unenforceable ab

initio because under California Civil Code 1558, an entity must exist to enter into a contract, or that "It is essential to the validity of contract, not only that the parties should exist, but that it should be possible to identify them."

111.   Additionally, the Defendants received mortgage insurance money from the mortgage insurance carrier who paid on the Defendant's and filed a claim with said insurance carrier, allowing the Defendants to receive payment from said insurance carrier. The Defendants subsequently filing of a foreclosure action in state court without standing. Plaintiff purchased mortgage insurance expecting to receive honest financial and insurance services from the Defendants and yet the Defendants foreclosed in order to obtain double recovery of the debt. Plaintiffs therefore asks this Honorable Court to provide declaratory and injunctive relief that the Defendants, especially COLLEGIATE CAPITAL ADVISORS, LLC and PATRICK HANSEN be order to cease and desist any and all actions to evict the Plaintiffs from the subject property, that the court issue an order declaring the subject debt paid in full from the proceeds derived from the mortgage insurance policy and that the following instruments be expunged: The Trustees Deed, the two assignments of Mortgage described above, the Substitution of Trustees described above and any publicly recorded documents that declare that the Plaintiffs are in default.

## RELIEF REQUESTED

112. We ask for restoration of the title of the subject residential property into our names, we ask for cancellation of the instruments identified previously. We ask for treble damages for any overbilling and excessive charges based upon what can be learned in the discover process and exemplary damages in the amount of $ 80,000.00 Silver one ounce coins minted in the United States of America by the US treasury. We ask for such other relief as the court may direct.

1
2
3
4    Dated _8-30-2016_
5
6    Signed _Ronald Cook_
7                Ronald Cook
8
9    Signed _Christine Cook_
10               Christine Cook
11
12
13
14
15                    **VERIFICATION**
16
       We have read the **Complaint For Civil Rico Title 18 § 1962(a),1962(c), 1962(d)**
17
    and know the contents thereof to be true; and the same is true of our own knowledge, except to the
18
    matters, which are therein stated on our information and belief, and as to those matters, we believe them
19
    to be true. The foregoing is true, correct, complete and not misleading to the best of our knowledge.
20
    Sealed by the voluntary act of our own hand on this _30 august 2016_          (date).
21
22
23   _Ronald Cook_          _Christine Cook_
24
25     Ronald Cook                    Christine Cook
26
27
28   _____

1
2                              **LIST OF EXHIBITS**
3
4   EXHIBIT A                  Billing Statement from NATIONSTAR MORTGAGE, LLC
5                              Identifying the $ 218.00 per month payment for LPMI
6
7   EXHIBIT B                  First Assignment of Deed of Trust assigning the mortgage to THE
8                              BANK OF NEW YORK MELLON dated June 7, 2013
9
10  EXHIBIT C                  Second Assignment of Deed of Trust assigning the mortgage to
11                             NATIONSTAR MORTGAGE, LLC dated August 27, 2013
12
13  EXHIBIT D                  Securitization Audit
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28